A case in Re Semcrude, L.D. No. 12-2746, Mr. Werb and Mr. Sossler. Welcome. Yes. Good afternoon. Wayne Werb on behalf of the Appellant's Nuke Oil Company, CNS Oil Company, Cross Properties, Inc., Wayne Thomas Oil and Gas, and William R. Earnhouse Company.  No problem. Thank you. Good afternoon. It has been a long road of travel for us to come to where it is going today. We go back to September of 2008 at the beginning of the Semcrude bankruptcy. If you could just clear up just a couple of things for me. Sure. The file was September 8th of 2008, and they had a procedures order entered later that month. Approximately two weeks later. I think they filed on the 17th or so. And ultimately, you've said, a year or so later, there is a plan. Yes. And it's confirmed, and you vote, the two of the four appellants vote in favor of it. Did all four appellants receive money under the plan? Yes, partial payments. And so, you're seeking full payment, or what? We're seeking full payment in addition to the relief that we had requested in our original complaint, which also requested class certification status. Is the full payment that you received the $210,000 that's referred to in the papers? Yes. Is that a collective sum? Collective with regard to the four claims that we're representing. Okay, thank you. And so, you're claiming that you still have $207,000 to you, is that correct? That's correct. Now, you're claiming to represent the, what, other Oklahoma producers? Similarly situated. What we have, Your Honor. Have these producers settled before the plan was put into effect? Our clients? The class you're purporting to represent. Not the four clients. Not to my knowledge, no. These are individuals that are out there, small-moment producers, who may have gotten something as part of a settlement. We don't know exactly how many. It was estimated originally that there were approximately 1,000 Oklahoma producers out there, small-moment operators, who survived by producing two of the barrels of oil that they would sell to Central New Mexico. There was $160 million-plus or minus distributed to Oklahoma producers, correct? Correct. So some of the members of your class could have received money under that $160 million, in addition to the $210 million? That would be correct. Well, if that's the case, then are they not bound by the settlement? If they chose to participate in the settlement, take settlement monies, are they people who could rightfully be represented in the class action? Your Honor. There was no prohibition in the plan itself that would preclude these individuals from accepting some portion of funds. When I talk about the plan, I'm trying to figure out something about the settlement. The settlement is absorbed into the plan in some fashion. I'm trying to understand what's really at stake, because the assertion is that if relief of the sort you're seeking is granted, it's going to sink this plan, it's going to disrupt things so badly that the whole thing falls apart. So you come back and say, we're already talking about a few hundred thousand dollars on a class-wide basis, maybe as much as 40, but that's not much in the overall context of the $2 billion estate. So the question that I'm trying to get you to respond to is, how much is really at stake with the alcohol producers? And if you got what you wanted, would that open the gate to producers from any other state who's got a similar statute that wants to come forward and say, hey, take care of us too? What I can say is this. The $40 million figure arises from the amount that had been set aside for producers. The amount that, in the form of other disbursements to the bank and everyone else, what was left, based upon the total amount of Oklahoma oil sold during the relevant period, was $40 million. Now, at the end of the day, we can't determine the number of people out there that could benefit from this class. So it's going to be something less than $40 million? It could be, yes. And that's why we attempted to paint the worst-case scenario with a perfect storm. It could be as much as $40 million, but that would represent approximately 2% of the total amount of this multibillion-dollar reorganization plan. What about other producers from other states that might have a similar statutory right of this sort that you're claiming? This is not something that we ever considered. It was strictly limited to Oklahoma, based on the Oklahoma approved. The statute of limitations at this point would probably address that concern, that they would not be in a position to go forward because they would be barred by the statute of limitations. So what are you seeking from us today? I mean, obviously, we're not getting to the merits, whether there should be a class, whether the merits of what you're actually seeking in terms of the trust that you claim exists. What do you want from us today? What we're seeking here is simply to be permitted, pursuant to the rules of the federal bankruptcy procedure, specifically 7001, that we can move forward with our adversarial proceeding. And if, by any chance, we can't have a certified class, we would go further. But at this moment, we're in a position that we would request our relief, that the determination made by the district court regarding that would be reversed. Yeah, throughout this case, throughout both briefs, the whole mansuree decision of our court comes up both ways. Yes. And the issue that I'd like you to answer is in the mansuree decision, let me put my judgment on the top, she talked about you have to look at these cases in the context of each case. And the mansuree was markedly different from this case. It was an attempt, some call it lien stripping, some call it lien invalidation, whatever. Here, it's a different case. Why, in the context of this case, haven't you had appropriate notice and opportunity to be heard? We've been denied that by the bankruptcy court, by the district court. They've indicated to us that, you know, the time is not now. You'll eventually have your day. You'll clinch an opportunity, but you'll eventually have your day in court. So it relies upon previous judicial decisions. But let's go back a step. Under Mullane, how much notice and opportunity are you entitled to under the Constitution in the context of this case? I believe it's reasonable under this particular case that the due process rights of these individuals, however similar they're situated, is a paramount concern. It's a difficult case. We believe that we can bootstrap it. When we look at Federal Rule 7001, it specifically states that if a property interest is at play, or there's a risk of forfeiture of a property interest, you have the right to commence a necessary complaint. We also saw belief... Okay, let me stop you right there. Okay. I agree with that. But here you had the producer's action. Yes. You had the virtual action, which you object to under Sturgill. I object to Sturgill, yes. But there was that action. You had an opportunity to participate in that. You chose not to participate in that. We chose not to, because what was being indicated there were issues involving liens and trusts, and that's something that had been fashioned... The application was fashioned between debtors and large oil producers in our council. It indicated that, under that scenario, that you did not need to participate. But if you did, regardless of whether or not you participated, you would be bound by the outcome. Now, in our case, it was distinctly different. We were looking at the situation of these small oil producers who were not in the position that they could be adequately represented, and therefore we looked at the concept of the class-action lawsuit. We also alleged other counts, which included fraud. And most importantly, we also requested a declaratory judgment with regard to the significance and importance of Section 541B of the Code, because we were alleging that the property at issue, i.e., the oil, that was in possession of the debtor by petition was, in fact, not their property. It was not property of the debtor's estate. So that is one of the main reasons why we could not emerge and become part of the procedures order. And further along through the process in this case, you had the June decision, which then was followed up not by a determination by this Court, because we had the appeal. That's correct. In fact, I think Sergey and Louie may have been sitting on that appeal. But a settlement. You ended up with a settlement in which your clients participated through the confirmation of the plan. Now, how does all of that amount to Millane's opportunity to work? Well, I can only say this, that the individuals who accepted the funds, these people were desperate. They had no choice. They were expecting that eventually they would have their day in court. This was 15 months after the time that we had filed. They believed in the system. They believed that the rules would control their day in court. So from a standpoint of notice, I believe here that they were well within their rights to do what they did. There was no prohibition, as I understand it. In the confirmation order that was precluded them from accepting those funds. Can you tell us why you didn't move for a stay? Was there a procedure, an assertion that you were entitled to have a certain procedure? Well, first of all... I know you're upset that they stayed. You weren't ready to turn around and say, okay, now I'm going to stay. All right. Well, actually my time is up. All right, bye. Keep going. When the debtors and others effectively waived the requirement of a stay by waiving the contingency that the appellant's class claims be resolved in the plan at that point, once those interested parties waived that condition, expressly designating that the class action complaint as the waived procedure, they agreed to the continuation of our appellant's lawsuit and the appeal notwithstanding consummation. So we believe that was their action. We had filed our appeal. And then prior to the effective date, they needed the Secure Creditors, or rather the Secure Creditors Committee and the debtor. Collectively, they executed that waiver, which no longer made it possible for them to deal with it. That explains why he might be able to say we still believed we had a live action. But since equitable mootness is all about how things have gone so far down the road that they can't be unwound, how does declining to move for a stay answer that point? The fact that transactions are taking place, reliance is being supposedly put in the finality of this plan, why does he do nothing to try to say, hey, stop this boat, because we have issues that have to be addressed? Well, actually, what we were looking for and what we were waiting for is to move forward with our appeal through the district court. Sure, but that's why a person would seek a stay, wouldn't they? But again, we did not believe that the stay was necessary as a result of the actions that were taken by the debtor, the lender, and the Secure Creditors Committee. They consciously made the decision, you know what? We're not going to be able to confirm this plan without dealing with the legal adversary. So in order for us to move forward with plain confirmation, we're going to simply remove that as a condition precedent to plain confirmation. But by doing that, our position was that the case was viable, that it was alive, that we could move forward. And therefore, a stay was not necessary. Did you say that the bankruptcy court gave you assurances that your adversary proceeding would be heard? Expressly, expressly. When we objected to the procedures plan, when we stood up and said this is a doubtful constitutional validity, something is wrong here, we cannot bind people, we have a right to go forward with our own adversary complaint, it was denied. We filed our motion for reconsideration. That was denied, but did the judge say, okay, you're dead? Absolutely. Isn't it just a question of whether or not the matter will be deferred? You'll eventually get your day in court. And then eventually, when we appealed to the district court requesting leave to appeal an interlocutory order, i.e. the motion for reconsideration, it was then the district court judge, in reliance upon the statements contained in the transcript from the bankruptcy court, that denied that motion for appeal of the interlocutory order. And the judge saying, in reviewing the transcript, I see here that the court has indicated that you will eventually have your day in court. So we have two courts here who expressly stated to us, it's not your time. We won't tell you when it's your time. And then we get to the confirmation hearing. And I stand up and look at the bankruptcy court judge and say, well, here we are. You promised us our day in court. And now we are here on the eve of confirmation. We filed our objection timely. The objection was overruled by the court. So at every juncture, at every stage, we attempted to do as much as we could do, until we got to the point that the motion for equitableness was filed. We're denied our right to go forward. Is that the way the system works? Is that the way it was intended? Did you think there is any such doctrine of equitableness? Quite frankly, then Judge Alito was a visionary. He saw exactly the potential threat, you know, the potential abuse that could take place with regard to this equitable doctrine. And I must say, look at what's happened here. The equitable doctrine is being used as a sword against us. Did you preserve your objection to the application of the doctrine in this case anywhere? Preserve our objection? I would hope that as part of the record of everything you've done, we in fact have, yes. We'll hear from Mr. Sosslin. We'll get you back on the boat. Thank you very much. Mr. Sosslin. I'm going to close the court. I'm going to suss in for a senior criminal, and then we'll fill it. That was his affidavits in this case. Let's pick up where we left off with Mr. Werb. He's saying that he was told that he would, by the bankruptcy judge, that he would get his day in court with regard to the adversary proceeding that they brought way back in September of 08. He still hasn't gotten the day in court. And equitable mootness is a feminist doctrine. And here he's arguing that it's completely unfair when they've been told that they'll get their day in court to be denied it. Is this the right case to apply equitable mootness? Yes, Your Honor. It is the right case to apply equitable mootness. And Mr. Werb's assertion regarding the contention, first of all, involved with the process, in the context of the Chapter 11 plan. Yeah, I'm not going to tell you what it is now. We'll get to the bankruptcy issue. But the issues were raised, and his comments were true in the plan. But did he ever have a chance to have them dealt with? He had the chance to object to whatever treatment was made in the settlement agreement. He had a specific concern, Mr. Shostakovich. The assertion in your complaint is, this oil is not property of the estate. You can't have that. It's not yours. It shouldn't be in the estate at all. Was that question ever addressed? Other than in the settlement agreement? No, Your Honor. The settlement agreement, did they settle? Did the lukewarm people settle? And there's some settlement agreement that you guys haven't given us that would make this whole exercise a crazy use of people's time? Because if there's a settlement agreement that says they didn't, that they gave those rights up, it wasn't in the record before us. It's not. If Your Honor is suggesting that everyone is so credible in having to go through the requirements out of the bankruptcy code, put it on us. No, I'm suggesting that if somebody's got an adversary action that has a specific claim in it, and that has never been addressed by the bankruptcy court or the district court, and you come in and say, yeah, but there was a settlement, it would behoove you to produce a settlement that shows that the people who brought the claim gave it up. Your Honor, that lie exists inside and outside of bankruptcy. There are a lot of similarities to the way similarly classified claims are treated under the confirmation scheme. And all that aside, didn't those at the confirmation hearing waive the prohibition against the adversary proceeding going forward as a precondition? We did not, but we didn't. But that's because, as of the record, Your Honor, there's more than one way in which it's going to count. So that was just a way to get them out of the way and then say later, gotcha. Because by saying we're waiving that as a precondition, are you not saying we acknowledge that those claims are wide and will have to be dealt with? I would disagree with that as sort of an ambush, Your Honor, if that's how you characterize it. I'm just saying, without using your characterization, you said more than one way to skin a cat. So you're out to skin them, it sounds like. The question is, is it a fair way to skin your cat? Yes, Your Honor. Because that's what is provided for in the bankruptcy code. And Judge Shannon acknowledged that the court was not briefed on the exact language, but it may be that you're understated or something, and you were brought a confirmation, and that that issue is not before you today. How does that work, Mr. Chaucer? Because doesn't that come after Judge Shannon said, you're going to get your time in court? I mean, I read the transcript. It seems to say just what Mr. Worth says it says. He says, we'll hear you. And then it stayed, and there's nothing, and there's nothing, and there's nothing. And then that confirmation says, well, maybe it's moved, but I'm not going to talk about that today. How does that work within the context of the fairness called for by the court in this one-on-one due process? It works because you can't take the statement outside of the context in which it was made. Judge Shannon's statement in the context of the procedures order was that at that time, and I don't know whether the procedure was not moved because of a problem, but in the test case that went forward, it was not binding on anybody. It was set up based to the contrary. It would be binding upon everybody in the case. And I don't know if that affected Judge O'Sullivan's justice. I've got to stop you there, because when you say it's not binding, by its terms it purported to be binding. Did it not? It said it's binding. You've read it. I could read it to you. We could read it off the record. It says this is going to be binding, doesn't it? It did say that, Your Honor. Okay. So then you seem like a real nice guy, Mr. Salsa. How is it that you can stand up in front of us and say, well, it wouldn't be binding, when the court said, I'm sure it wasn't binding? I think when a lawyer finds out it's not, it doesn't matter because that's not the decision that was before the court today. Isn't that exactly what's before the court today? They made a due process claim. They've also said it's unfair for equitable justice to make a claim against us. But if we're talking about fairness and we're talking about due process, how is it not before us that the court said, among other things, and you're arguing it to us, don't list something down. There was a test case. Because what we're arguing before today is that under Section 1141A of the Bankers' UK, it says that every claim that is bound by the provision of the claim, whether or not the defendant did accept the claim, that the due process requirements in the claim were satisfied by the applicant and no object to the Chapter 11 claim of the organization. Isn't that the very purpose of Rule 7001? It's because there are certain things that the drafters of the code and the rules decided are not adequately addressed within the planned process, and so they are to be carved out and dealt with in adversary proceedings. What's the purpose of 7001 if it's not to recognize that there are some things just not really well handled in the context of planned confirmation? If I was there when you were scrolling the address, I think it's distinguishable, because what the plan did, like the Chapter 13 file in the first, was modify rights of secured creditors. Hold on, Mr. Sasse. I'm happy to hear you on that, but I want you to answer the question I've just posed to you. I'd be interested in knowing what your position is on the meaning of 7001 if it is not to say there are some things not adequately dealt with in the confirmation process, so we're taking them and we're going to treat them as things that require adversary litigation. If that's not the meaning of 7001, what does it mean? Why does it exist? I think that the news in the last couple of days almost reflects that, and I realize you can rely on the same pretensions with other letters. I'm coming back to equitable movements. You settled with a number of the producers. Is that correct? Yes, sir. Is there any form of a settlement agreement that's in the record? I couldn't find one. The settlement agreement is a term sheet, as I understand it, but the settlement is embedded in Article 3 of the Chapter 105 that was confirmed by the court. Is there any other provision in the settlement agreement that isn't in the plan? No, sir. Is there a settlement in the plan or confirmation? Is there, quote, a settlement agreement that's different than the term sheet and different than the terms in Article 3 of the plan? There's not a settlement that's different than Article 3 of the plan. That's not what my question was. I said is there a settlement agreement. Sir, document. Is there a document? Yeah, the settlement agreement is in the plan. Because it was only effective after the confirmation. Was there a settlement agreement entered into prior to the plan? There were certain people that you settled with, I assume, as a prelude to plan negotiations. Is that correct? There were some sets of approvals that were involved in the negotiation of a term sheet and judicial remediation. His question was, is there a separate settlement capital agreement? Some document that people signed that we could say, hey, it's not in the record. Give us the settlement agreement. Is there something like that? No. The settlement agreement is in the plan. So there's no agreement that you made it into with any of the other Oklahoma producers at all? The agreement is the Article 3 of the plan and the confirmation of the agreement. My first answer was I asked if there was a settlement agreement, and a couple of sentences before that you said no. Is there a separate document? No.  No sign. No separate signed settlement agreement? With anyone? With anyone. Other than the term sheets that was negotiated over the weekend in September of early that was negotiated. Was the term sheet signed by the people who were negotiating? It was signed by a group of people who were present in that negotiation. And that's part of the record? We said it was attached. I believe that it is a part of the record. Is it a separate part of the record? I'm not sure. The disclosure settlement was part of the record below. And you said I believe the term sheet is. . . I could be wrong. If it is not, if you could just have that post-oral, just submit it to us. The only thing I was concerned about in the Chapter 11. . . Understood. What I'm trying to nail down is prior to the negotiation of the confirmation order and the plan, there was no settlement agreement with any of the producers held. That's correct. Okay. It looks to me like there's essentially three levels here, or three hurdles, that the nuclear weapons have to get over in order to prevail. They have to find, or we have to find for them, that that nuclear weapons does not apply here, and that eventually we should allow this to go forward. They then have to win on finding that there is a class. So they basically have to satisfy Rule 23. And my gut reaction is there would be a lot of hurdles there, at least with respect to the others, because they've accepted the plan. It appears that they're not doing anything further. And then they would have to win on the merits of the issue that they're seeking to get mitigated, which is what they initially found the adversary proceeding. And my guess is you probably feel pretty comfortable on the class action and the merits. Is that correct? That's correct. So if you feel pretty comfortable on that, why try to take a controversial doctrine that's rooted in equity and deny them the equity, the fairness of having a hearing that you think they're going to lose anyway, on either one or both issues? Well, probably never going to get to the second issue except with respect to that, perhaps. Because, you know, the final thing is carve money out of the dispute among all of the creditors over competing loan claims and fungible cash and fungible oil and gas properties, which is all going to settle on the plan of splitting it up almost out of that property and leaving $50 million of working capital for the reorganized debtor, which is my client. Mr. Simpson, that says you don't want to do it, but that doesn't really respond to the question of what's fair about preventing them from having their position at least heard and decided. If you think— Especially if it's not a debtor. If you think it was decided by the— If you think about it when it comes to the settlement and the settlement deciding those claims, they purport to represent a class of claims, but the class that they purport to represent was described in the suit notice as the secured producer claims under the plan. Just like if for some reason they were started as suit outside of bankruptcy, and for some reason it was sold, they were able to manage those under the remittance clause section that had described the class that they were remittance of, they would be bound by it. But these other parties, they didn't initiate adversary proceedings. Is that correct? That's not correct, Your Honor. They didn't? There were numerous adversary proceedings, all of which were stated by the original procedures order. Did they agree to have their claims dismissed as a condition for planned confirmation? None of the other adversaries agreed to have their claims dismissed as part of a condition for planned confirmation. Were some of those adversaries Oklahoma producers? Yes, Your Honor. Other Oklahoma producers? Yes, Your Honor. The lead one, I believe, was including Simpson, and the rest of them, I know that I haven't been able to spot. Yeah, I know. I lost track. I know it was Kansas and Texas. Okay. So what Mr. Warden said, that if the class were completely full with everybody who possibly had a claim, the outside limit of liability would be $40 million. But in looking at this, it seems as if the number is probably much, much less than that, based on the fact that a lot of these parties had their claims dismissed as a condition for planned confirmation. The Lukerola appellants did not have their claims dismissed as a condition for planned confirmation. That was waived, right? That was waived. So where does the claim come to be threatened on a $2 billion estate by a claim that's somewhere south, broadly well south of $40 million? $40 million is still $40 million, because I don't have the value of the rest of the value of the proof. $40 million is 80% of the cash that was given to me when I started on the appellant. It's not the value of the common stock of the individual, which is not cash that's available to pay a claim. And there was only something less than $50 million that Manchester was claiming on the issue of whether or not something was property-based. $50 million less. You can sell me that $10 million by talking to some bad guy. So you have, at the outside, then you're saying $30 million. Let's just say, think of it all, $30 million. Where would it come from? I'm assuming it would come from where I started on the solution. But it wouldn't come necessarily just from working capital, would it? I mean, you've got a $2 billion entity here. It would be $2 billion. It actually wouldn't come from working capital. It would be the cash that the company would buy, and it would be working capital. I guess the point is it doesn't necessarily come from the $50 million pot you have right now, right? Would you have to go back and re-solicit on the plan? We haven't had a plan in a long time. So if you don't have to go back and re-solicit on the plan, and our cases hold that essentially the key thing that you're looking for is whether you're going to knock the props out from under the plan, and this doesn't do that, how in the world does this ever really work? If this doesn't cost us $2 million, it's absolutely liquidated, because it overlaps with the plan. With people who have voted on it and are bound by the plan and have not voted on it... That sounds like you went on the merits. Or it sounds like you went on a part of the merits, right? I mean, it's conceivable that they could be denied class action status and still have their claim written on the merits, right? You know what? If their claim was with four people, could we get somewhere around $207,000 more than what we're paid? I suppose I agree with that. However, the June decision that they complained about was not in effect, because it was a June 19th decision. The June 19th decision of Judge Sheldon would have provided very similar effect. And under the bankruptcy court, under the settlement under the non-June 19th decision, under the settlement under the non-June 19th decision, 50% of the claims. So, if you're going to go back, that's really what's being said in the status quo, that before June 19th, having went back to the state, the $200,000, the $800,000, the $400,000, I don't think that that's what we're talking about. I don't think we did really have an amendment under this clause. We did believe that these claims were bound by the plan. If they're not bound by the plan, there's got to be some benefits of it. Two of them voted for the plan. Two of them did not. Is that correct? That's correct, Your Honor. But they're going to all receive the benefits of the settlement under the plan. So, your assertion is that in order to preserve their rights, they had to have refused receipt of the funds. Do you have any authority for that? Well, actually, that's not my assertion, Your Honor. But, I mean, I recommend that I think in order to preserve their rights, to amend the plan, we should have tried to simply stay in the conference room. You know, the one thing that bothers me here, among many, is that you weighed the risk of what we have left here. And you weighed it on the basis that you said it was meritless. I mean, that's a big waiver. You're saying, well, you know, we'll take our chances. There's no merit to that claim. And if there's no merit to it, what's the concern? We actually believe, Your Honor, that assuming that you find the decision to dismiss the reconfirmation of yours, would that not allow you not to go and seek to dismiss the other self-assertion in the grounds that the covenants are bound by Article 41 of the bankruptcy code and the confirmation are valid. And that in terms of provision, including the confirmation, it is under Article 42. What happens to the specific question raised in their complaint that we should never have been in this estate? You say in your brief, hey, we've never denied that they're lien holders. This is about the value claim. They say, well, you've never denied we're lien holders. We've never said we're lien holders. We're saying we're not property of the estate. You can't treat us like this. We have a right to be heard on that point, and we've never been heard on that point. Would you respond to their argument that it's fundamentally contrary to due process to tell somebody, you know, I'll hear you on that later, I'll hear you on that later, and then later come say, no, I'm not hearing on that. This isn't a case where they're trying to grab a billion or an automobile or some finite piece of property and say that that property is not part of the estate. Fungible is fungible. There are over $3 billion of secured landers and hundreds of millions of dollars of producer claims, all seeking, all arguing that under one statute towards whom or another, each had claims. So unidentified fungible, so individual unidentifiable, or cash, I know that that's the marginality, but because of the nature of the disputes, because of the nature of the disputes, I think that the settlement is a fair opportunity to really object to the settlement. It's fair, just like parties to a bound by class actions have the right to object to those class actions. It is approved that it may be bound by it. And were they heard on that point? That's the critical issue, right? You said people in class actions have a right to be heard and to object. Did they have their specific point, their adversary action point, that were not part of the estate? Was that ever addressed? Because they said it was moot, right? The court said it's moot. Gotcha. What made you agree to waive the condition of paying confirmation with respect to that? We agreed to, from time to time, we had a moot in this case, and we had a bond that was supported by clearly thousands of creditors. That's right. Why would you not say, look, we're not going to waive. We're going to go forward on this. And did they have a veto over the point? They could be outvoted, right? They were outvoted. Correct. Actually, they weren't outvoted because we voted for a plan on that. So what did you get from granting the waiver? From the adversary proceeding to go forward? That all of the participating creditors got what they paid. In fact, the bonds themselves received with the distribution of the plan would not have been moot. If we had moot, then it would have fallen into the position of the plan that would not have been consolidated. So we were able to consolidate the plan and distribute all of the value that the bonds could tell to everyone, including the bonds, and rely upon the provisions of the bankruptcy code to dismiss the adversary proceeding at the appropriate time. And hence the casket. Let's just go through the first four factors that were laid out by our court in the common element one. The first was their consummation, a substantial consummation of the plan. And remember, we said that that is a, if you comply with 1102, that's not enough. You've got to show that the plan will not have, again, to use the words of our court, props knocked out from under it. You won't have to go back and start all over. How do you address that? You're saying to us today that you don't think you'll have to re-solicit if they are allowed to go forward on their adversary proceeding. It's not going to undo the plan. However, I don't understand the question. The plan is substantially consolidated. Under 1102. Under 1102, correct. But basically our court has said since then what that really means is that it's not just consummation in the definitional sense. It's to the point where the plan will be in jeopardy. The plan will no longer be able to be workable and you'll have to go back and redo. I don't think you're telling me you have to go back and redo this plan. You're completely doing the plan if you're putting at risk 80% of American capital reserved for the U.S. Now you're saying 60% actually. 30 out of 50. No, I'm sorry, you said 30. I thought you said probably it would be 30. Well, I guess maybe what J. Ambrose is asking, are you going to have to go back to all of the other creditors and say kick in your prorated share for what we need to pay Lucor Oil if they're successful? The loaners or successors who own 95% of the organized debtors, I suppose, will effectively kick in their share. The problem is that the plan was consolidated over three years ago. It's a public, this is a publicly traded company. So what we're doing is taking the value then not from the lenders who received the loan at the time, but whoever now holds the public stock that was originally distributed to lenders in 2009. And then people who presumably took this recognizing that there was an adversary action that was reserved, right, and that's on record. There's an adversary action out there, the viability of which has yet to be determined, right? Right. So let's just deal with that for the moment before I go to class. If they are entitled, if they ultimately win and they are the merits and they are entitled to an additional $207,000, that doesn't unravel the plan, does it? No. And then if there is up to $30 million that could go to a class, and the suspicion is that it's significantly less, would that unravel the plan in its entirety? If the class is certified, in terms of dollars there, yeah, I believe it unravels. And is it going to come undone? I think that's not the same thing. The second chapter of the case is not necessarily the same thing with respect to the loans. What does it mean to say the props are going to get knocked out forever? It doesn't mean that now we have to go back and reorder things because otherwise we don't have a viable entertainment, a viable way to move forward? I think that it's... I suppose that's a weird way to look at it. I think here it conveys... I don't think... I wouldn't want your client or anybody else to think that we're treating tens of millions of dollars as a trivial matter. What we're not, what we are trying to understand is what does it mean in the context of this specific act, in this specific bankruptcy? Because that's what we're obligated to do in figuring out equitable mootness, right? So in that light, if this was $30 million, I think you could even make an argument that since everybody got, or at least they got 50 cents on the dollar, if you figure that's true across the class and they had 40 million claims before, maybe it's more likely that the downside risk is 20 million because they've already gotten 20 of the 40. So if you're looking at $20 million... I'm going to apologize. This will be my last question, I promise. If you figure that that's real money and that's out there, how do you square the assertion that that would be a threat to the viability of the plan with what your adversaries argue is a multimillion-dollar threat coming from the BP claim, which the court has said, okay, go ahead. But that aside, the presumed claims for the BP claim are general unsecured claims. They cannot... General unsecured creditors receive a fair amount of share of stock, a small amount of stock, and watch the ratio. There are hundreds and hundreds of claims. The $20 million represents a fair amount of share of the ultimate. A lot of claims represents the minimum, the sum piece of a minimum of stock, a minimum of equity of choice, a maximum of clients, an interest, a motivation, trust, all of which are not property of the M&A's dollars. So there's a pot set up for that. So you're saying there's a pot of money set aside for that, unlike what's at issue here? Because there is a reserve and a distribution of right, litigation, trust, interest, common stock, and what not. Now, let's move to the other case, the Manchester Appeal. What impact did any... should the Manchester Appeal have on this case? Should it be preclusive, should it be persuasive, or should it be clear? Well, on most of the... on most of the equity and minimum sectors, it should be either preclusive or persuasive. The facts are the same. You didn't argue that. You may argue that. So you didn't argue that it was preclusive and brief. We did not. Okay. We noted that on some of the facts, So in your brief argument, it was persuasive. You're saying now that it should be considered to be preclusive. We thought that the... We thought it should be on the... Okay. I have no further questions. Actually, I have further questions, but I'll stop. Thank you very much. Mr. Worth. Our clients never settled with Sencrude. And... Did anybody? None of the other parties out there that I'm aware of. So there's no... You don't disagree. There's no settlement agreement. There's not some settlement agreement. There's no settlement agreement. There's nothing in the record to support that. Okay. What was a highly competent judge like Judge Shannon doing in understanding that there was a settlement agreement? Because it's talked about in the briefs as a settlement agreement. There's indications that a settlement agreement was incorporated in the plan. Where does all that come from? That comes out of the producer litigation and the settlement that was eventually that led to the plan confirmation. That's the settlement that they're referring to. Okay. So the settlement's right. That's what's in Section 3 of the 5-year requisition. Yes. And are you guys found on that? No. Why not? If you take cash money, why shouldn't you be heard to complain? Well, yes, I like the money, but I don't want to interfere with the rest of what was agreed to as part of that agreement to settle things. Well, their rights were not fully redressed in terms of compensation, number one. Number two, however, is that we go back to the filing of our adversary complaint, identifying the funds that we're looking at for recovery. Well, hold on. I'm trying to ask a specific question, and you're doing it inartfully. And I think the questions that we were pressing on Mr. Shawson go to this point. In order to say you don't get to do something because you're part of a settlement, usually what happens is somebody shows up with a document that says settlement agreement. There's a contract. People can look at the contract. They can say these are the terms. There's your name. You signed it. You're precluded. In the context we're in right now, what does it mean to say there's a settlement agreement? What does it mean for you to say we weren't a part of it? We were not a part of that settlement. We were not a part of that because we continued down the road of waiting for our litigation to be heard before the court. Is there any legal significance to your taking a check that you understand is coming to you as part of a settlement and depositing it in a bank account and using that money? Is there legal significance to that? Not from the standpoint of prohibiting these producers from going forward with their litigation. Why not? I don't believe they were bound by accepting a partial amount of funds as part of this overall global settlement. That doesn't preclude them from attempting to recapture the balance that was owed to them and to proceed with their litigation. So it almost seems as if were you to not be barred by this equitable movement, this doctrine, they would argue that you are bound by the preclusive effect of the plan. They would argue that you don't have a valid class. And they would argue that you don't go under the merits of the substantive claim that you brought back in September of 2008. Well, here's the claim. That's right. But again, what we're looking for, just so that we're on the same page, we're not seeking any more than what the parties out there would have been entitled to had we been permitted to commence the litigation back in September of 2008. We're not asking for anything more. But the issue involving 541B, dealing with the fact that we alleged that it was not property that was estimated because the debtor had mere legal title and not equitable title to the audible debt it took from these producers and never paid for. That has never been adjudicated by any of the litigation which has taken place throughout the course of this entire bankruptcy. That was never, ever litigated. Let me ask you one other question here on the equitable movements question, which is really the issue, the major issue before this court. Where did the district court abuse its discretion in reigning the motion to find that your claim was equitably moved? Well, in response to that, I would say that we would need to look at the manner with regard to the supposed analysis which they had performed with regard to each of the five potential factors. In reviewing that document, it appears that no analysis was performed with regard to any of those factors. Instead, what we see is a recitation of the five potential factors that are listed. There is some additional information that was injected into that order that came from opposing counsel, but we're not even referenced. It was not even referenced in that memorandum order itself. So when they waived the condition with respect to you, in connection with the plan going forward, was anything brought to record before the court as to why it was done? No. They just said it was waived? Yes. And how do you interpret the waiver? The waiver gave us the opportunity to go forward because they could not have performed or effectuated plain confirmation in the absence of dealing with the luke oil adversary. So that waiver was important to them. That waiver was important to us because it suggested that our case was alive and that we would be able to go forward and pursue our case. So there was a stay in place? Yes. And the state that we've been in, the state of Purdue is there. Exactly. So here we stand four and a half years later. We're still stayed. And all we're asking for are the rights that were afforded under the Constitution and with regard to the Federal Rules of Bankruptcy Procedure. Will we be given that opportunity to do now, which we should have done four years ago? Thank you very much. Thank you to both counsel for a very well-presented argument. I'm going to ask that counsel get together with the clerk and have a transcript of both of those arguments, but the clause in either way. And also, Mr. Sossin, if you would check the record to see if the term sheet that is attached to the disclosure statement is in the record. If it is not, if you would see that it is sent to us within the next week or so.  Okay. Thank you very much. Thank you. Thank you.